TAC Invs., LLC v. Rodgers, 2020 NCBC 88.

STATE OF NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
20 CVS 2757

TAC INVESTMENTS, LLC,

               Plaintiff,

v.

JOHN RODGERS,

               Defendant.

**ORDER AND OPINION ON
DEFENDANT'S MOTION TO DISMISS
AND MOTION FOR SANCTIONS**

1.     GoPrime Mortgage, Inc. ("Prime") is a residential mortgage company. This case arises from a dispute between its two shareholders. The plaintiff is TAC Investments, LLC ("TAC"), which became a shareholder in February 2017. The defendant is John Rodgers, Prime's founder. In short, TAC alleges that Rodgers has used his position as director to stop Prime from paying dividends. This has rankled TAC because its shares are preferred and have priority to dividends. Also, TAC believes that Rodgers is purposely keeping cash in Prime's accounts to increase the value of his "put" right—a contractual right to divest his shares at a price based on the company's value. Though it asserts a handful of claims, TAC chiefly seeks a declaration that Rodgers may not exercise his put right in these circumstances.

2.     Rodgers has moved to dismiss all claims under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure. (*See* ECF No. 17.) He has also moved for sanctions under Rule 11. (*See* ECF No. 8.) For the following reasons, the Court **GRANTS** in part and **DENIES** in part the motion to dismiss and **DENIES** the motion for sanctions.

*Fox Rothschild LLP, by Matthew N. Leerberg and Troy D. Shelton, and Condon Tobin Sladek Thornton PLLC, by Aaron Z. Tobin and Jared T.S. Pace, for Plaintiff TAC Investments, LLC.*

*Alston & Bird LLP, by Matthew P. McGuire and Kelsey L. Kingsbery, for Defendant John Rodgers.*

Conrad, Judge.

## I.
## BACKGROUND

3. The following background is drawn from the amended complaint and its attachments. (*See* Am. Compl., ECF No. 10.)

4. Rodgers founded Prime in 2005. (*See* Am. Compl. ¶ 8.) From the beginning, he has served as the company's president, secretary, and treasurer. (*See* Am. Compl. ¶ 9.)

5. When TAC became a shareholder in February 2017, it acquired half of Prime's outstanding shares, and Rodgers retained the other half. They entered into a shareholders' agreement to govern their relationship. Among other things, the agreement limits the board of directors to two members and allows each shareholder to appoint one. (*See* Am. Compl. Ex. 2 § 3(a) ["Shareholders' Agrmt."].) Rodgers appointed himself to the board, while continuing to serve as president, secretary, and treasurer. (*See* Am. Compl. ¶ 9.)

6. The shareholders' agreement also specifies when and how the parties may transfer their shares. Relevant here are the "put" and "call" rights defined in section 7. These rights allow one shareholder or the other to mandate a transfer after a period of time has passed. The put right allows Rodgers to divest his shares at any time starting in February 2020. (*See* Shareholders' Agrmt. § 7(a).) The call right, on

the other hand, allows either Prime or TAC to force a shareholder (most likely to be Rodgers) to sell shares starting in February 2022. (*See* Shareholders' Agrmt. § 7(b).) In either case, the share price depends on Prime's fair market value, as calculated through a formula comprising earnings, cash, and debt. (*See* Shareholders' Agrmt. §§ 1, 7(c), (d).)

7. Rodgers and TAC own the same number of shares but not in the same class. All of Rodgers's shares are common; all of TAC's are preferred. (*See* Am. Compl. ¶ 11.) The difference between the two, spelled out in the articles of incorporation, largely has to do with dividend priority. The board is supposed to declare and pay dividends at least twice per year "to the extent of Available Cash, if any." (Am. Compl. Ex. 1 Art. 2, § B.II.(a).) Priority goes to TAC, as owner of the preferred stock, until the total outlay exceeds a defined "Liquidation Amount." (Am. Compl. Ex. 1 Art. 2, § B.II.(a).) The preferred stock will then automatically become common. (*See* Am. Compl. Ex. 1 Art. 2, § B.IV.(b).) But until that point, Prime may not pay dividends on the common stock, nor may it redeem or acquire the common stock. (*See* Am. Compl. Ex. 1 Art. 2, § B.II.(b).) Although nothing requires Prime to pay out the Liquidation Amount by a specific date, Rodgers allegedly promised to "operate Prime so that TAC's investment would be repaid quickly." (Am. Compl. ¶ 33.)

8. According to TAC, that hasn't happened. Despite having ample cash to pay dividends twice yearly, Prime declared a dividend once in 2017 and once in 2018, shy of the Liquidation Amount by a wide margin. (*See* Am. Compl. ¶¶ 18, 19.) Since then, Rodgers has blocked the board from declaring another, most recently in February

2020. (*See* Am. Compl. ¶¶ 20, 21.) TAC alleges that this was strategic: by voting to hoard cash, Rodgers boosted the value of his put right just as it ripened. (*See* Am. Compl. ¶ 54.) He then exercised the put right a week later. (*See* Am. Compl. ¶ 23, Ex. 3.)

9.    TAC filed suit immediately. The original complaint included a single claim, seeking a declaratory judgment that "Rodgers may not exercise his put rights . . . until Prime first pays TAC the Liquidation Amount in full." (Compl. ¶ 28, ECF No. 3.) TAC's theory was that the put right "would require Prime to purchase" Rodgers's shares, flouting the ban on acquisitions of common shares while preferred shares remain outstanding. (*See* Compl. ¶¶ 13, 15, 24.)

10.    In response, Rodgers moved to dismiss the complaint and asked for Rule 11 sanctions. (*See* ECF Nos. 6, 8.) The basis for each motion was the same. In his view, the shareholders' agreement requires TAC, not Prime, to buy the divested shares. Rodgers contends that TAC's contrary interpretation is untenable.

11.    Shortly after Rodgers filed his motions, the coronavirus pandemic led to a lengthy statewide stay of civil cases. When the stay lifted, TAC amended its complaint as of right, modifying the claim for declaratory judgment and adding three new claims. TAC continues to seek a declaration that Rodgers may not close on his put right until the Liquidation Amount is paid. It also alleges that the shareholders' agreement "is ambiguous as to who must purchase Rodgers's common shares" and seeks a declaration that Prime must do so. (Am. Compl. ¶¶ 25, 41.) In the alternative, TAC asks the Court to reform the shareholders' agreement so that Prime

is responsible for buying Rodgers's shares. (*See* Am. Compl. ¶ 47.) In addition, TAC claims that Rodgers breached his fiduciary duty and the covenant of good faith and fair dealing. (*See* Am. Compl. ¶¶ 52, 53, 60.) The amendment mooted the motion to dismiss but not the motion for sanctions.

12. Rodgers has again moved to dismiss the amended complaint. (*See* ECF No. 17.) That motion and the motion for sanctions have been fully briefed. At a hearing on September 17, 2020, the Court directed each side to file supplemental briefs related to jurisdiction over the claim for declaratory judgment. Both motions are now ripe for determination.

## II.
## MOTION TO DISMISS

13. A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of the complaint." *Isenhour v. Hutto*, 350 N.C. 601, 604, 517 S.E.2d 121, 124 (1999) (citation and quotation marks omitted). The motion should be granted only when "(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Corwin v. Brit. Am. Tobacco PLC*, 371 N.C. 605, 615, 821 S.E.2d 729, 736–37 (2018) (citation and quotation marks omitted).

14. In deciding the motion, the Court must treat the well-pleaded allegations of the complaint as true and view the facts and permissible inferences "in the light most favorable to" the nonmoving party. *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 332, 828 S.E.2d 467, 471 (2019) (citation and quotation marks omitted). Exhibits to

the complaint are deemed to be part of it and may also be considered, *see Krawiec v. Manly*, 370 N.C. 602, 606, 811 S.E.2d 542, 546 (2018), but the Court need not accept as true any "conclusions of law or unwarranted deductions of fact," *Wray v. City of Greensboro*, 370 N.C. 41, 46, 802 S.E.2d 894, 898 (2017).

## A. Declaratory Judgment

15.     TAC seeks twin declarations: that Prime is the party obliged to purchase any shares subject to Rodgers's put right but that it may not do so until it has paid the Liquidation Amount.  Rodgers moves to dismiss the claim, arguing that the shareholders' agreement unambiguously requires TAC, not Prime, to buy his shares.

16.     First, there is a threshold issue.  An actual controversy between adverse parties is an essential "jurisdictional prerequisite" for any claim for declaratory relief. *Gaston Bd. of Realtors, Inc. v. Harrison*, 311 N.C. 230, 234, 316 S.E.2d 59, 61 (1984) (quoting *Adams v. N.C. Dep't of Nat. & Econ. Res.*, 295 N.C. 683, 703, 249 S.E.2d 402, 414 (1978)).  The judiciary has no power to "give a purely advisory opinion which the parties might, so to speak, put on ice to be used if and when occasion might arise." *Tryon v. Duke Power Co.*, 222 N.C. 200, 204, 22 S.E.2d 450, 453 (1942).

17.     Here, the put right has an escape clause.  If Rodgers disputes the valuation of his shares after giving notice of his intent to exercise the put right, he may withdraw the notice, making it "void for all purposes."  (Shareholders' Agrmt. § 7(a).) The time for Rodgers to make that decision has not yet passed.  At the hearing, the Court asked counsel whether this rendered the dispute about the put right

hypothetical and invited supplemental briefing on the issue. Both parties contend that the dispute is ripe and that the Court has jurisdiction.

18. After careful consideration, the Court agrees. There is a live dispute between these parties. Rodgers has exercised his put right, triggering a valuation process and revealing an interpretive dispute about who must buy his shares. The interpretive dispute is concrete: TAC contends that Prime must buy Rodgers's shares; Rodgers contends that TAC must do so. The dispute has also clouded the parties' rights and relationship, and closing cannot take place until it is resolved. To be sure, Rodgers could call off the transfer, and if he does, the declaratory-judgment claim might become moot. But the potential for mootness exists in nearly all cases, whether through settlement, dismissal, or remedial action. That potential does not make the current dispute hypothetical or advisory.

19. It follows that TAC has stated a claim for relief. "A motion to dismiss for failure to state a claim is seldom appropriate 'in actions for declaratory judgments, and will not be allowed simply because the plaintiff may not be able to prevail.'" *Morris v. Plyler Paper Stock Co.*, 89 N.C. App. 555, 557, 366 S.E.2d 556, 558 (1988) (quoting *N.C. Consumers Power, Inc. v. Duke Power Co.*, 285 N.C. 434, 439, 206 S.E.2d 178, 182 (1974)). A trial court should dismiss the claim only "when the complaint does not allege an actual, genuine existing controversy." *N.C. Consumers Power*, 258 N.C. at 439, 206 S.E.2d at 182. As each side contends in the supplemental briefing, there is an actual, genuine controversy related to which entity must buy Rodgers's shares.

20. Rodgers argues that the issue is so one-sided in his favor that the Court should dismiss the claim anyway. Usually, the question at this stage is not whether TAC "is ultimately entitled to the declaration it seeks." *Legalzoom.com, Inc. v. N.C. State Bar*, 2012 NCBC LEXIS 49, at *8–9 (N.C. Super. Ct. Aug. 27, 2012). Even so, things are not as clear as Rodgers contends.

21. Section 7(a) of the shareholders' agreement defines the put right but does not identify the intended purchaser. The only mention of the purchaser is in section 7(d), which governs closing procedures for the put right and the call right. That section requires the seller—whether exercising the put right or responding to the call right—to deliver stock certificates "for transfer to the purchasing Shareholder(s)." (Shareholders' Agrmt. § 7(a).) Rodgers insists that the "purchasing Shareholder" must be TAC because the agreement defines "Shareholder" to mean Rodgers and TAC, not Prime. That is a reasonable interpretation. But there is another reasonable interpretation. Because Prime may exercise the call right and purchase Rodgers's shares, it could be a "purchasing Shareholder" too. The phrase is ambiguous. *See Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 524–25, 723 S.E.2d 744, 748 (2012) (concluding that contractual language having "more than one possible meaning" was ambiguous).

22. The Court therefore denies the motion to dismiss the claim for declaratory judgment. *See Johnson's Landing Homeowners Ass'n v. Hotwire Commc'ns, LLC*, 2018 NCBC LEXIS 113, at *11 (N.C. Super. Ct. Oct. 29, 2018) (denying motion to

dismiss when plaintiff alleged actual controversy); *Gvest Real Estate, LLC v. JS Real Estate Invs., LLC*, 2017 NCBC LEXIS 32, at *9 (N.C. Super. Ct. Apr. 6, 2017) (same).

B. Reformation

23. As an alternative to its claim for declaratory judgment, TAC seeks to reform the shareholders' agreement. TAC alleges that the parties intended to make Prime responsible for "purchasing Rodgers's common shares upon the closing of his put right" but failed to say so either due to a mutual mistake or TAC's unilateral mistake. (Am. Compl. ¶¶ 43, 47.) TAC contends that the agreement should be reformed to align with the parties' intent.

24. "Reformation is a well-established equitable remedy used to reframe written instruments where, through mutual mistake or the unilateral mistake of one party induced by the fraud of the other, the written instrument fails to embody the parties' actual, original agreement." *Metropolitan Prop. & Cas. Ins. Co. v. Dillard*, 126 N.C. App. 795, 798, 487 S.E.2d 157, 159 (1997) (citation and quotation marks omitted). To state a claim based on a mutual mistake, "[t]he party seeking reformation must allege the provision that was agreed upon, the provision that was written, and that the mistake was mutual." *Huss v. Huss*, 31 N.C. App. 463, 467, 230 S.E.2d 159, 162 (1976) (citing *Matthews v. Shamrock Van Lines*, 264 N.C. 722, 142 S.E.2d 665 (1965)). To state a claim based on a unilateral mistake, the plaintiff must allege, among other things, that "the conduct of the promisor caused the improper expression." *Carter v. West Am. Ins. Co.*, 190 N.C. App. 532, 537–38, 661 S.E.2d 264, 269 (2008).

25. The amended complaint adequately alleges a mutual mistake. Construed liberally, the allegations show that the parties intended that Prime would purchase Rodgers's shares if he exercised his put right; that the shareholders' agreement mistakenly leaves the identity "ambiguous"; and that the mistake was mutual. (*See* Am. Compl. ¶¶ 25, 43, 45.) This suffices to state a claim. Although Rodgers faults TAC for failing to cite drafts, letters of intent, or other communications to evidence the mistake, (Def.'s Br. in Supp. Mot. Dismiss 12, ECF No. 18 ["Def.'s MTD Br."]), "[i]t is not required that the pleader allege facts as to how and why the mutual mistake came about," *Huss*, 31 N.C. App. at 467, 230 S.E.2d at 162.

26. TAC's allegation of a unilateral mistake falls short, however. A claim based on unilateral mistake requires a showing that the defendant induced the mistake and caused the error in the written document—for example, by "drafting, or having drafted, an instrument contrary to the previous understanding of the parties and permitting the other party to sign it without informing him thereof." *McCallum v. Old Republic Life Ins. Co.*, 259 N.C. 573, 577, 131 S.E.2d 435, 438 (1963) (citation, alterations, and quotation marks omitted). The amended complaint alleges nothing of the sort. All that TAC alleges is that Rodgers falsely represented "that he would operate Prime to repay TAC's investment timely." (Am. Compl. ¶ 46.) Even if true, that does not show that Rodgers caused the error in the shareholders' agreement. "The mistake of one party to the . . . instrument, alone, not induced by the fraud of the other, affords no ground for relief by reformation." *Crawford v. Willoughby*, 192 N.C. 268, 272, 134 S.E. 494, 496 (1926); *see Lefever v. Taylor*, 2009 N.C. App. LEXIS

1243, at *18 (N.C. Ct. App. July 21, 2009) (affirming summary judgment because plaintiff had not alleged "that the inclusion of [a] one-year limitation was induced by the mistake, fraud or misrepresentation of defendant").

27. The Court therefore denies the motion to dismiss the claim for reformation, limited to the alleged mutual mistake.

### C. Breach of Fiduciary Duty and Constructive Fraud

28. In its third count, TAC asserts claims for breach of fiduciary duty and constructive fraud. The parties dispute whether the amended complaint adequately alleges a fiduciary relationship between Rodgers and TAC, which is an essential element of each claim. *See, e.g.*, *Panzino v. 5Church, Inc.*, 2020 NCBC LEXIS 17, at *7–8 (N.C. Super. Ct. Feb. 12, 2020); *Brown v. Secor*, 2017 NCBC LEXIS 65, at *18–19 (N.C. Super. Ct. July 28, 2017).

29. In general, shareholders "do not owe a fiduciary duty to each other or to the corporation." *Freese v. Smith*, 110 N.C. App. 28, 37, 428 S.E.2d 841, 847 (1993). Majority shareholders have a duty to protect the minority, but Rodgers is not a majority shareholder. He owns exactly 50 percent of Prime's stock, (*see* Am. Compl. ¶ 11). *See Potts v. KEL, LLC*, 2019 NCBC LEXIS 30, at *11–12 (N.C. Super. Ct. May 9, 2019) (noting that shareholder with 50 percent interest is not a majority shareholder).

30. TAC contends that Rodgers is a controlling shareholder, if not a majority shareholder. (*See* Pl.'s Opp'n Mot. Dismiss 11–14, ECF No. 27.) "[O]ur Supreme Court has not decided whether a minority shareholder exercising actual control over

a corporation owes a duty to other shareholders." *Panzino*, 2020 NCBC LEXIS 17, at *12 (citing *Corwin*, 371 N.C. at 616, 821 S.E.2d at 737). Even if that were the law, though, TAC has not adequately alleged that Rodgers wields actual control. The parties entered into an arms'-length shareholders' agreement that gives each substantial rights, including an equal say on the board of directors. It is an arrangement that allows Rodgers to withhold his consent and block corporate action but not to control the corporation. *See Corwin*, 371 N.C. at 618, 821 S.E.2d at 738 (observing that a shareholder with "a contractual right to withhold its consent and effectively veto any dividend payment" does not become a controlling shareholder by exercising that right); *Upchurch v. Sapp*, 2020 NCBC LEXIS 118, at *11–12 (N.C. Super. Ct. Oct. 8, 2020) (granting motion to dismiss because complaint lacked allegations of control); *Potts*, 2019 NCBC LEXIS 30, at *12–14 (granting summary judgment because shareholders had equal power on board of directors).

31. At the hearing, TAC suggested that Rodgers "holds all the cards" in their relationship even if he is not a controlling shareholder. But again, TAC is far from powerless. It has the same voting rights as Rodgers. (*See* Am. Compl. Ex. 1 Art. 2 §§ A.III., B.I.) And it controls half the board of directors. (*See* Shareholders' Agrmt. § 3(a)(i).) TAC agreed to this division of rights in the sort of arms'-length transaction that does "not typically give rise to fiduciary duties." *Dallaire v. Bank of Am., N.A.*, 367 N.C. 363, 368, 760 S.E.2d 263, 266 (2014).

32. The Court therefore dismisses the claims for breach of fiduciary duty and constructive fraud.

D. Breach of Implied Covenant of Good Faith and Fair Dealing

33.   The final claim is for breach of the implied covenant of good faith and fair dealing. "In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." *Bicycle Transit Auth., Inc. v. Bell*, 314 N.C. 219, 228, 333 S.E.2d 299, 305 (1985) (citation and quotation marks omitted). TAC's claim is based on allegations that the parties agreed Prime would pay dividends twice each year but that Rodgers used his position as officer and director to halt the payments.

34.   Rodgers argues, first, that the claim must be dismissed because TAC has not also alleged a breach of the shareholders' agreement. (*See* Def.'s MTD Br. 21.) This is incorrect. "While implied covenant claims are nearly always paired with a breach of contract claim in North Carolina practice, they need not be." *Vitaform, Inc. v. Aeroflow, Inc.*, 2020 NCBC LEXIS 132, at *13 (N.C. Super. Ct. Nov. 4, 2020) (citing *Richardson v. Bank of Am., N.A.*, 182 N.C. App. 531, 556, 643 S.E.2d 410, 426 (2007)).

35.   Next, Rodgers contends that a plaintiff may assert an independent claim for breach of the implied covenant only "where a special relationship exists between the parties, such as contracts for funeral services and insurance." (Def.'s MTD Br. 20, 21–22.) As one federal district court has observed, this is "an incorrect over-generalization of various North Carolina state appellate cases." *Robinson v. Deutsche Bank Nat'l Tr. Co.*, 2013 U.S. Dist. LEXIS 50797, at *39–40 n.11 (E.D.N.C. Apr. 9, 2013). Our courts have not limited the claim in that fashion. *See, e.g., Maglione v.*

*Aegis Fam. Health Ctrs.*, 168 N.C. App. 49, 58, 607 S.E.2d 286, 292 (2005) (addressing claim based on one party's exercise of discretionary right under contract).

36. The Court therefore denies the motion to dismiss the claim. *See Richardson v. Utili-Serve, LLC*, 2020 NCBC LEXIS 135, at *9–11 (N.C. Super. Ct. Nov. 17, 2020) (denying motion to dismiss claim based on LLC member's discretionary right under operating agreement).

## III.
## MOTION FOR SANCTIONS

37. Next, the Court turns to Rodgers's motion for sanctions. This motion relates to the original complaint, which alleged that "[a]n exercise of Rodgers' put right would require Prime to purchase Rodgers' common shares, in accordance with the terms of the Shareholders' Agreement." (Compl. ¶ 13.) Rodgers contends that the allegation is baseless, contradicted by the plain text of the agreement. (*See* Def.'s Br. in Supp. Mot. Sanctions 6–7, ECF No. 9.)

38. Rule 11 requires every pleading to be signed by an attorney, certifying that it "is (1) well grounded in fact; (2) warranted by existing law . . . (legal sufficiency); and (3) not interposed for any improper purpose." *Bryson v. Sullivan*, 330 N.C. 644, 655, 412 S.E.2d 327, 332 (1992). "A breach of the certification as to any one of these three prongs is a violation of the Rule." *Id.*

39. Rodgers does not allege an improper purpose. Only the factual and legal sufficiency of the original complaint are at issue. The test for factual sufficiency is whether the alleged offender made "a reasonable inquiry into the facts" and, after assessing that inquiry, "reasonably believed that his position was well grounded in

fact." *Kohler Co. v. McIvor*, 177 N.C. App. 396, 402, 628 S.E.2d 817, 822 (2006) (citation and quotation marks omitted). The test for legal sufficiency is whether the pleading is facially plausible and, if not plausible, whether the alleged offender made a reasonable inquiry into the law. *See Ward v. Jett Props., LLC*, 191 N.C. App. 605, 607–08, 663 S.E.2d 862, 864 (2008). "[I]n determining compliance with Rule 11, courts should avoid hindsight and resolve all doubts in favor of the signer." *Twaddell v. Anderson*, 136 N.C. App. 56, 70, 523 S.E.2d 710, 720 (1999) (citation and quotation marks omitted).

40.     The Court concludes that the original complaint was factually and legally sufficient for at least three reasons. First, TAC attached the shareholders' agreement to the complaint, confirming that it made a reasonable inquiry into its terms. (*See* Compl. Ex. 2.) Second, the shareholders' agreement is ambiguous. As noted, section 7(a) does not say who is responsible for purchasing Rodgers's shares. Rodgers bases his interpretation on an oblique reference to "the purchasing Shareholder(s)" in section 7(d). His interpretation of that phrase is reasonable, but so is TAC's. The claim is facially plausible. Third, Rodgers's put notice does not identify his intended counterparty. TAC says it understood that Rodgers intended to make Prime the purchaser. (*See* Pl.'s Opp'n Mot. Sanctions 8, ECF No. 11.) In hindsight, that understanding was erroneous; judged at the time, though, it supports the plausibility of TAC's claim and the reasonableness of its belief that the claim was well grounded.

41.     Rodgers also points to a guarantee given by TAC's principal, Greg Lindberg. The document states, in relevant part, that Lindberg guarantees "the due and

punctual payment by [TAC] of any amounts required to be paid to [Rodgers] upon exercise of a Put Right or a Call Right under" the shareholders' agreement. (Def.'s Br. in Supp. Mot. Sanctions Ex. B.) This parol evidence supports Rodgers's position, but it does not conclusively resolve the ambiguity. This is particularly true given that Rodgers filed his motion before the parties began discovery, which remains open. Contractual ambiguities are questions of fact and should be resolved on the merits after discovery, not through the lens of a prediscovery motion under Rule 11.

42. The Court denies the motion for sanctions.

IV.
CONCLUSION

43. For all these reasons, the Court **GRANTS** in part and **DENIES** in part the motion to dismiss. The claims for breach of fiduciary duty and constructive fraud are **DISMISSED**. The Court **DENIES** the motion to dismiss the claims for declaratory judgment, reformation (limited to the alleged mutual mistake), and breach of the implied covenant of good faith and fair dealing.

44. The Court **DENIES** the motion for sanctions.


**SO ORDERED**, this the 7th day of December, 2020.


/s/ Adam M. Conrad
Adam M. Conrad
Special Superior Court Judge
 for Complex Business Cases